UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 21-60020-CR-DIMITROULEAS/SNOW

UNITED STATES OF AMERICA

vs.

RICHARD WASERSTEIN,

_____/

**RICHARD WASERSTEIN'S SENTENCING MEMORANDUM**

Richard Waserstein, through counsel, respectfully submits this Sentencing Memorandum, in which he seeks to demonstrate to the Court that he should receive a lesser sentence than Dr. Drew Lieberman.

This Court recently sentenced co-defendant Drew Lieberman to 13 months in prison. Both Dr. Lieberman and Richard Waserstein accepted responsibility, pleaded guilty, and cooperated with the Government. However, because Dr. Lieberman (agreed guideline range of 108-135 months) was significantly more culpable than Richard Waserstein (agreed guideline range of 41-51 months), Richard should receive a lower sentence. Dr. Lieberman, responsible for the so-called "comfort drink," also agreed with the Government that he would not seek a downward variance while the Government did not so limit Richard. Indeed, the probation office has recommended a downward variance for Richard. PSR at ¶158.

Other significant reasons for a downward variance for Richard include:

- Richard has cooperated with the Government to provide assistance in its cases against multiple co-defendants.  Although he has not testified in any official proceedings, his cooperation substantially assisted the Government in trial and pending investigations and was disclosed to other defendants. He was disclosed as a cooperating witness in the Dr. Jose Santeiro trial and to the Markoviches ahead of their sentencings.

- Richard's primary participation in his brothers-in-law's substance abuse rehabilitation businesses was largely as a passive investor. Unlike the other seven defendants, Richard was **<u>not</u>** charged with health care fraud, paying and receiving kickbacks, or bank fraud. And unlike the other defendants, he was not involved in operations, recruiting, marketing, patient referrals, patient care, patient recycling, length of patient stays, providing illegal drugs to patients, billing insurance companies, doctoring medical records, or audits.  Instead, his primary connection to these facilities concerned contributing to and receiving money from the corporate accounts of Compass and WAR.  In other words, he was significantly less involved than the executive officers, directors, and doctors at the businesses. According to the Government, "Richard Waserstein … is different" from the other co-defendants.  D.E. 621, at 12.

- The proposed loss numbers overstate Richard's culpability based on the Court's final loss calculations for the other defendants. The parties intended that Richard be held responsible for his "true participation in the scheme and what was reasonably foreseeable based on [his] conduct" – which was considerably less than the Markovich brothers, D.E. 621, at 14 (Markovich Sentencing Transcript), and Lieberman. And as stipulated by the parties, "Waserstein was less involved in day-to-day of the business than J. Markovich…" Waserstein Factual Proffer, at 2.  Accordingly, he should be held responsible for less than these defendants.

- Richard is a first-time, non-violent offender, who has led an exemplary life, including a great deal of charitable deeds throughout his life that have helped hundreds of people.  There is no chance that he will re-offend.

- Richard is 60 years old and has serious medical issues, including anxiety, uncontrolled Type II diabetes, high blood pressure, high cholesterol, uncontrollably high triglycerides, and recurring pre-cancerous colon polyps that require frequent monitoring and invasive screening procedures which will be greatly affected by the less than rigorous standards of Bureau of Prisons medical care.

### I.   Richard Waserstein has Provided Substantial Assistance to the Government

As the Court knows, Richard Waserstein is the brother-in-law to Jonathan and Daniel Markovich.  Richard's wife is the Markovich brothers' sister. Richard is also related to Drew Lieberman through marriage.  This previously very close extended family has been torn apart since Richard chose a different path than his brothers-in-law – to do the right thing and accept responsibility for his offense.

In addition to choosing not to waste the Court's and Government's time with another protracted, expensive trial, Richard made another decision.  Although it has caused significant anguish and conflict among the members of his family, Richard made the decision to cooperate with the Government to begin to make amends. Without knowing whether he would receive any benefit or could provide any new or substantial assistance, Richard chose to sit down with the Government to affirm his wrongdoing and disclose what he knew about others.  To date, Richard's cooperation includes:

- Disclosure as a cooperator in advance of the sentencing hearings of co-defendants Jonathan and Daniel Markovich;

- Being listed as a witness in the trial of Jose Santeiro;

- Participating in numerous telephonic and in-person debriefings with the Government for hours at a time to answer questions, share information, and examine documents;

- Spending hours prior to each debriefing to sufficiently prepare, gather documents, and refresh his recollection; and

- Continuing to cooperate in the ongoing investigation of Dr. Jeffrey Draesel.

Despite the fact that Richard was not called to testify in the Government's most recent trial as a witness, it was not because his candor or credibility was questioned. Rather, the Government acknowledges that he was forthright and truthful. And while providing trial testimony would have certainly earned him *more* credit, his beneficial and reliable assistance to the Government, disclosure of the fact of his cooperation to others, willingness to testify, and continued assistance generate *some* reduction. Although ultimately not called, Richard's disclosure as a cooperating witness has resulted in co-defendants and the public treating him as though he had.

Whether or not the Government files a § 5K1.1 motion, the Court can consider and credit Richard's assistance and choice to do the right thing. Even absent a Government motion, a judge may vary downward due to a defendant's effort to cooperate under the § 3553(a) factor of the "history and characteristics of the defendant." *See United States v. Terry*, 3:10-cr-00017 (M.D. Fl. Jan. 6, 2012) (Court gave weight to defendant's attempts to cooperate with Government, although no 5K1.1 motion was filed), *aff'd* 494 Fed.Appx. 991 (11th Cir. 2012). *See also United States v. Barner*, 572 F.3d 1239, 1250 (11th Cir. 2009); *United States v. Siordia*, 19-cr-20348-Moreno (S.D. Fl. Feb. 5, 2020); *United States v. Lamour*, 0:08–cr–60208 (S.D. Fl. Feb. 12, 2019) (trial court granted downward variance based on cooperation although Government did not file 5K1.1 motion).

In addition to considering the Government's recommendation, the Court can also look to the research and statistics of the U.S. Sentencing Commission with

regard to 5K1.1 sentences. In the latest fiscal year for which there are statistics, the mean percent decrease from the *bottom* of the guidelines in fraud cases was 59.8.[1]

Further, the below table tracks the sentences of other defendants who, while acting as attorneys, committed offenses and thereafter cooperated.  In contrast to the defendants in the table, although Richard is an attorney, his legal knowledge and law license were not used to carry out or facilitate this offense.  Nevertheless, the chart illustrates that, because of the overall benefit to the system, prosecution, and society, courts frequently show leniency to defendants who choose to cooperate, even those that are attorneys.

| Name | Case  No. | Case | Sentence |
|------|-----------|------|----------|
| Jan Atlas | 19-cr-60258 (S.D. Fl. Aug. 27, 2021) | **Attorney** Atlas and co-conspirators were involved in a fraudulent commercial lending scheme that concealed facts from investors. Atlas personally drafted professional opinion letters to give legal cover for the business in an attempt to shield the company from state and federal securities laws.  Sentencing guidelines were 30-37 months. | **8 months incarceration** |
| Metthew Ledvina | 18-cr-10445 (D. Mass. June 3, 2020) | **Attorney** Ledvina and co-conspirators ran a $164 million global stock fraud scheme buying up stocks and then using reverse mergers and promotion of companies to artificially boost the price of shares that they then dumped on unsuspecting buyers.  Court credited his "efforts to seek redemption" and apologize for his conduct.  Sentencing guidelines were 46 to 57 months. | **2 1/2 years Probation** |

---

[1]*See* Sourcebook, United States Sentencing Commission, accessed at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2021/Table40.pdf

| Name | Case No. | Case | Sentence |
|---|---|---|---|
| Andrew Wilson | 17-CR-20883-KMW (S.D. Fl. Jan, 18, 2019) | **Attorney** who wrote false and fraudulent legal opinion letters that furthered securities fraud, but later cooperated with Government. | **5 years Probation, with 7 months home confinement** |
| David Lubin | 17-CR-20508-MGC (S.D. Fl. Jan. 17, 2019) | **Attorney** who provided false legal opinions, acted as shell buyer and broker, recruited straw shareholders, and sought buyers of shell companies received over 65% reduction in sentence in securities fraud case after cooperation. | **1 year and 1 day** |
| Alan Koslow | 16-CR-60146 (S.D. Fl. Nov. 10, 2016) | **Attorney** pleaded guilty to conspiracy to launder money from illegal gambling and drug dealing.  After being caught, Koslow provided cooperation on other investigations. | **1 year and 1 day** |
| Rashmi Airan-Pace | 14-CR-80067, 14-CR-20910 (S.D. Fla. June 16, 2015) | **Attorney**, who acted as closing agent and knowingly falsified HUD-1s and hid material facts from banks, facilitated $19 million mortgage fraud scheme. Sentencing guidelines were 57 to 71 months. | **1 year and 1 day, later reduced to Time Served (5 mos)** |

We ask the Court to take all these things into consideration in finding that a downward variance from the low end of the guidelines is warranted due to Richard's cooperation.

## II.     The Nature and Circumstances of the Offense

Richard Waserstein does not want to minimize his wrongdoing or provide excuses.  We do, however, feel the need to differentiate Richard from others and provide context and background to Richard's involvement and his other numerous activities.

The most apparent distinction differentiating Richard from every other person involved in this case is the fact that he was not charged with healthcare fraud. The

Government did not charge Richard with the overarching crimes of the conspiracy because he had little to no involvement in Compass and WAR. In the words of the Government, "Richard Waserstein … is different" from the other co-defendants. D.E. 621, at 12. The parties intended that Richard be held responsible for his "true participation in the scheme and what was reasonably foreseeable based on [his] conduct" – which was considerably less than the Markovich brothers. D.E. 621, at 14 (Markovich Sentencing Transcript). And as stipulated by the parties in his Factual Proffer, "Waserstein was less involved in day-to-day of the business than J. Markovich…" Waserstein Proffer, at 2.

Drew Lieberman had direct, hands-on involvement with the conspiracy, including drugging patients with the infamous comfort drink, and is clearly more culpable. In his factual proffer, Dr. Lieberman acknowledged conspiring with the Markovich brothers, Mr. Garnto, and Dr. Santeiro (not Richard), to commit healthcare fraud. His overt criminal conduct involved "prescib[ing] medications for Compass Detox patients, including controlled substances, prescription medications, and over-the-counter medications, in quantities and combinations that at times grossly diverged from legitimate medical practice, and which LIEBERMAN knew caused patients who took these medications to feel impaired and impeded their ability to participate in therapy." D.E. 495, at 2-3. Dr. Lieberman devised the comfort drink to keep patients sedated so that they would be more likely to remain at Compass Detox; the comfort drink also incentivized patients to continually return. Dr. Lieberman also furthered the object of the healthcare fraud conspiracy by using Dr.

Santeiro's login credentials to complete medical forms that were then relied upon by insurance companies reimbursing Compass. On the spectrum of culpability, the behavior Drew Lieberman engaged in was significantly more egregious than Richard both in terms of actual individual conduct, and the corresponding advisory sentence when applying the Guidelines to that conduct. As stipulated in his plea agreement, Dr. Lieberman agreed to a guideline range of 108-135 months in prison (almost 3 times Richard's low-end recommendation of 41 months). D.E. 494, at ¶ 15.

The charges too reflect Richard's different role.  Per the Government, he was charged with and "pled guilty to money laundering.  That's all that he was charged with in this case.  He was never charged with the underlying healthcare fraud conspiracy.  And what the Government's evidence showed for him … and what Mr. Waserstein [] admitted to in his factual proffer, concerns his knowledge about patient brokering and patients being paid and patients being taken out on the boat at WAR. And … that is what the Government's evidence would have shown had [it] proceeded to trial against Mr. Waserstein.  It would not have shown the extensive involvement, for example, or hands-on involvement as Jonathan Markovich." D.E. 621, at 16.

Richard had no experience, time, or ability to manage or operate Compass or WAR.  Unlike others, Richard did not devise the health care fraud scheme, run the fraud, or otherwise assert any decision-making authority over day-to-day operations. Unlike the others, Richard was not paid a salary and went infrequently to the facilities – maybe 6 times over several years.  Contrary to other defendants, he was not involved in – or had knowledge of – administering or approving comfort drinks,

sedating patients with prescription and over-the-counter medications, patient recycling, unnecessarily extending patient stays, providing alcohol and illegal drugs to patients to get high, allowing fights and violence, permitting patients to have sex at the facilities, contributing to the relapse of patients, falsifying documents, allowing patients to skip therapy, having non-medical individuals make treatment and medication decisions for patients, ordering expensive medically unnecessary urinalysis testing, receiving kickbacks from connected drug labs, or group chats using codes words and discussions of patients with "good" insurance.

As far as his acts of money laundering, Richard did nothing sophisticated nor did he take steps to conceal what he was doing. In sum, Richard was provided proceeds generated from Compass and WAR and deposited them in personal or corporate accounts. The profits generated from Compass Detox and WAR represented a small percentage of his net worth and active investments. While these transfers would ordinarily be a perfectly legal and acceptable thing to do, there came a point in time—he believes in early 2019—when Richard learned that patients were being paid to attend Compass and WAR. Richard is ashamed and remorseful that he did not immediately step away from the business, which is why he was charged, pleaded guilty, and accepted responsibility.

Not only was Richard's lesser involvement reflected in the Indictment and then with more specificity in his plea agreement, but also in his PSR. Under Part E. Factors that May Warrant Departure, Paragraph 158 recommends a downward variance for Richard: "*As such, it appears that a sentence, below the advisory guideline*

*range ..., will promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct, and protect the public from further crimes of the defendant." Id.* [emphasis added]. Far and few between are the cases where the PSR recommends a variance below the guidelines. In those rare instances, as in this case, where the stars align between the type of offense, the defendant's role in the offense, and the relevant § 3553(a) factors, the Court should give special consideration and weight to the Probation Officer's recommendation. Here, the PSR has balanced Richard's role in the offense against the statutory sentencing considerations and has concluded that a sentence below the guideline range would still promote respect for the law, provide just punishment for the offense, afford adequate deterrence, and protect the public from further crimes. Richard's involvement in this case was a complete aberration from an otherwise exceptional life, something the PSR appears to comprehend with its recommendation for a downward variance.

Richard's work also provides some context to his involvement in this case. Richard primarily makes a living by working in two fields – law and real estate investment. Both areas take up all his time and would not allow him to participate in the day-to-day operations and details of Compass and WAR. He was simply too busy – and lacked the knowledge and interest – to have hands-on involvement in these substance abuse facilities. In contrast to others in the case who focused one hundred percent of their time and energy on Compass and WAR, Richard spent very little time and attention on the facilities. This is why Richard was not even charged

with health care fraud, unlike his co-defendants. His involvement in this case was limited to laundering some of the proceeds.

Richard has been a lawyer for nearly 36 years.  After practicing bankruptcy law and commercial litigation for several years after graduating from the University of Miami Law School in 1986, Richard eventually opened his own law office to focus on the area with which he was most familiar, real estate and real estate law.  In 2000, Richard opened Closings.com, Inc., a title agency that performed real estate closings – a company he has now given up because of his offense.  Over the last 22 years, Richard's business has conducted over one billion dollars in real estate closings with no money ever missing, no Bar complaints, and no issues with his title underwriter. Richard's title agency has been named numerous times in the President's Circle of the top 100 agents in Florida.  This is his specialty.  He has never practiced health care law.

Richard's other passion and income involves real estate investment.  Since an early age, he saw the value in working hard, researching, and investing in real estate and businesses.  At 18-years-old and while attending school, Richard obtained his real estate license and began working for a realty company.  Before the age of 21, he had already accumulated over $100,000 in real estate commissions and purchased and re-sold two condominiums.

Richard's attraction to projects and investments never waned over the next forty years.  Rather, his passion grew and his investments increased into larger and larger enterprises.  Richard now is involved in dozens of time-consuming, complicated

transactions and businesses at any given time.  Over the last several years (during the time Compass and WAR operated), this includes ventures throughout south Florida, such as:  The Palms (a project to build 40 single family homes in Hobe Sound), Pine Tree (a plan to build 40 townhouses in Hobe Sound), Auto Gallery (the purchase and construction of a warehouse in Hobe Sound with 20 auto storage units), Brickell Ten (the purchase of a 155 unit residential condominium building and resale of each individual unit), Portofino Apartments (the acquisition, renovation, and leasing of a 155 unit apartment building in Tampa), Prince Michael Hotel (an 88 room hotel in Miami Beach) the Marriott Residence Inn (the purchase of a 120 room extended stay hotel in Boca Raton), Candlewood Suites in Miami (a 130 room hotel near the Miami airport), two Holiday Inn Expresses (acquiring lots near the Miami and Ft. Lauderdale airports and securing the plans to build two hotels from the ground up), 75 Warehouse Management (purchasing and renovating an 80,000 square foot warehouse and creating smaller bay warehouses for tenants), Springtree Shopping Center (the purchase and partial rebuild of a shopping center in Sunrise), the Lombardy Inn Hotel (a 68 room hotel in Miami Beach), and many homes that he has purchased and re-sold over the years.

These are mostly huge, sophisticated deals that typically take many months to multiple years to complete.  Because each transaction requires Richard to contribute or guarantee an enormous sum of money, he spends a great deal of time analyzing and researching the viability of each investment.  He also involves himself in the review of legal contracts, the months required to finalize building plans with

architects and engineers, and time necessary to obtain approvals from city and county officials – the front-end work needed for a successful investment.

In addition to financing numerous real estate projects, Richard has also invested in multiple businesses, restaurants (including Luna Rosa, Lul, Prime 36, NY Bagel Deli Brickell, NY Bagel Deli Midtown), a costume jewelry company, an exercise machine company, a mortgage company, a finance company, and a real estate management company.

While Richard works countless hours, weeks, and months analyzing the details of a deal, once the business is operational, Richard is essentially a silent investor and takes no active role in managing and conducting business. He does not involve himself in the day-to-day operations of a hotel, apartment building, shopping center, or other type of business that he has invested in.  In each of these investments, acquisitions, construction projects, and/or sales, Richard joins one or more trusted people to invest with.  These individuals or individuals they hire are put in charge of operations and seeing that the business performs.

We provide this description of Richard's background and work history here to illustrate that, in this case, "Richard Waserstein … is different" from the other co-defendants.  D.E. 621, at 12 (AUSA De Boer at the Markovich sentencing hearing). It doesn't mean that he is free from guilt, but "[e]ach player had their own role.  Some did more, some did less."  *Id.* at 17.  Richard was an individual that did less in this case – because he frankly did not have the time or the inclination to get deeply involved because of all the other activities and investments going on in his life.

As he has done with all his other real estate projects and businesses, Richard joined other investors when he contributed to Compass and WAR. Individuals came to him to ask if he would invest with them in a rehabilitation business and Richard said yes. With this business, as with his others, Richard did not actively participate in the day-to-day running of the facilities. The testimony at both trials uniformly revealed that the intention at the start of these businesses was to run first-rate, legitimate facilities that helped people who desperately needed it. The testimony of Christopher Garnto during the Markovich trial spoke to the legitimate efforts that were taken to open Compass the right way, with good intentions. Mr. Garnto testified about the legitimate efforts he discussed with the Markovich brothers and Richard Waserstein, which included meetings with other facilities, industry conventions, and the call center. D.E. 558, at 184-85. In response to a question on direct examination regarding the quality of the Compass facilities, Mr. Garnto said, "[Compass] was a very nice facility. It was very posh. There was a huge outdoor area with lounging areas. It was nice…. It was a nicer facility." D.E. 570, at 250. Similarly, as argued by counsel for Dr. Lieberman at his sentencing, "[Dr. Lieberman] initially set out to try and help people…Drew saw this as an opportunity to try and do something different with his life." D.E. 718, at 10. That was what Richard expected and hoped would happen as he faded to the background as a silent investor in reliance on two lawyers and two doctors.

### III.   Loss Amount, Forfeiture, and Restitution for Richard Waserstein should be consistent with the Court's Findings for Other Defendants.

Because the parties have agreed on Richard's limited involvement in the facilities, the loss, forfeiture, and restitution in the PSR are overstated. While the parties agreed to a loss between $3.5 and $9 million for guideline calculations (D.E. 506, at 7, Waserstein Plea Agreement), the Court should find that this loss overstates Richard's participation in the offense and overestimates the loss that was reasonably foreseeable to him.

In contrast to Richard, the Government sought a significantly larger loss amount for the Markovich brothers—over $65 million for Jonathan and between $25 million and $65 million for Daniel.  D.E. 621, at 10.  Its argument for a greater loss level was rooted in the substantially deeper involvement of the primary operators and controllers of the facilities and the foreseeable harm that they caused.   In distinguishing Richard from his brothers-in-law, the Government stated that "the loss was calculated differently for [Richard] because [he] had different degrees of involvement than Jonathan and Daniel Markovich." *Id.* at 11.

Although the Court did not disagree with the Markoviches' role and amount of participation in the offense, it did disagree with the Government's calculations regarding loss.  The Court considered the brothers' assertion that the Government's approach to loss was incorrect and that it was wrong to use an amount that equated to 100 percent, or even 75 percent, of the money billed to insurance.  The Markoviches'

attorneys posited that "all of Compass was not an activity that was not worthwhile" and "not all of the people who were at Compass or WAR were people who were taken advantage of."  *Id.* at 71, 72 ("I would say 90 percent of those monies were earned by the Markoviches in doing good work for the people who were at Compass and WAR."). The Court ultimately agreed.  The Court sustained defense objections to the amount of loss, ultimately finding that loss was between $3.5 and $9 million for Jonathan and between $1.5 and $3.5 million for Daniel.  D.E. 621, at 21. The Court stuck to its 10 percent analysis after hearing from the Government in the brothers' sentencing, *Id.* at 75, as well as in subsequent sentencings. The same ten percent analysis was applied to both Dr. Lieberman and Mr. Garnto.

The same calculation and reduction should be made for Richard Waserstein. In order to be fair and consistent with respect to people's true participation in the scheme and what was reasonably foreseeable based on their conduct, the Court should find that Richard's loss level is far less than the brothers because his involvement was so much less and because this is what the parties intended. Richard had significantly less involvement than both Jonathan and Daniel.  Subsequently, the "pecuniary harm that [Richard] knew or, under the circumstances, reasonably should have known, was a potential result of [his] offense" was substantially lower than the primary operators of Compass and WAR.  U.S.S.G. § 2B1.1 (n. 3.(A)(iv)). Although the Government believes that approximately $5 million represents the loss that is attributable to Richard as a result of money billed to government insurance, the Court's findings on the percentage of fraudulent billing that actually occurred

requires a much lower loss amount. When the Government's loss number is reduced by 90 percent, the advisory guideline range drops by 4 levels, which equates to a reduction of at least 14 months from the bottom of the guidelines recommended by the Government.  Instead of a recommended advisory guideline level 22 (41 to 51 months), Richard's total offense level should be 18 (27 to 33 months).

The Court's analysis as to the Markoviches loss levels extended as well to the appropriate forfeiture and restitution.  Just as the Court reduced the guideline loss numbers by 90 percent, it equally reduced the forfeiture by 90 percent – from $5,945,144 to $594,514 for Jonathan Markovich and from $761,951 to $76,195 for Daniel Markovich.  D.E. 616, D.E. 617.  Similarly, the Court reduced Christopher Garnto's forfeiture amount to approximately $72,930.60, 90 percent less than the amount agreed to in his formal Plea Agreement (D.E. 246, at 9 – $729,306).  D.E. 693. Further, it reduced the restitution the Markoviches must pay by 90 percent from $21.225 million to $2,122,500 and from $18.5 million to $1,850,000. And most recently, the Court continued to apply the same metric in Dr. Lieberman's case, ultimately ordering $39,000 in forfeiture, a $20,000 fine, and $1,851,538.51 in restitution joint and several.

Thus, the Court has concluded with multiple defendants that the numbers the Government believed to be the reasonably foreseeable pecuniary harm caused by each individual should actually be 90 percent less than it requested.  The law of the case then dictates that the same analysis should apply to Richard Waserstein. Consequently, the calculation of Richard's loss level should be 14 (between $550,00

and $1.5 million pursuant to § 2B1.1(b)(1)(H)); his money forfeiture judgment should be $579,282 (10 percent of $5,792,828, D.E. 506, at 9); and the restitution he owes should be $270,109 joint and several (10 percent of $2,701,090, D.E. 506, at 12).

## IV.     The History and Characteristics of Richard Waserstein

Prior to this case, Richard had an excellent reputation in the South Florida business and legal communities, earned through decades of honest, hard work – a characteristic passed down through generations of Wasersteins. Richard's grandparents were born in Ukraine, Poland, and Romania. They fled those countries during World War II to avoid being killed by the Nazis in the Holocaust. They were penniless when they arrived in Cuba but felt fortunate to escape with their lives. Upon arriving in Cuba, his grandparents on one side of the family sold textiles on street corners, eventually acquiring real estate and opening multiple stores. Similarly, the other side of the family began small, working on the railroads and selling shoes to other railroad workers, which ultimately led to opening several shoe stores. Both pairs of grandparents started with nothing in their new country and grew to become very successful. Richard's parents, the children of these Eastern European immigrants, were both born in Cuba. During their late teens and early 20's, however, another dictator, Fidel Castro, rose to power threatening the lives and well-being of the Waserstein family. For the second time in as many generations, the family left behind all their belongings, properties, and businesses to flee and seek refuge in a safer country.

The Waserstein family found that sanctuary in the United States.  In the United States, Richard's family was given its second and third opportunity in life. But starting over from nothing was very difficult.  Richard's grandparents found work as a seamstress and salesman. While the family initially settled in Miami Beach, his parents sought work in New York, where Richard was born in 1962. At about two years old, the Waserstein family moved back to the Bay Harbor area of North Miami Beach.  His parents rented a small apartment where the three children shared a bedroom.  Richard's father opened a small retail store in downtown Miami, where Richard would work several days a week after school and on Saturdays when he became a teenager.  Not only did Richard work at his family's store, but he worked at the adjacent shoe store and an ice cream parlor, too. As the Waserstein family slowly got back on its feet for a third time, a strong work ethic and commitment to education became central in Richard's adolescence.

After graduating Miami Beach Sr. High at the top of his class, Richard entered Boston University, then transferred to the University of Miami where he later graduated with a degree in Business Administration, specializing in Finance and Real Estate. Upon graduating (a year early) from college, Richard immediately enrolled at the University of Miami's School of Law.

As a newly licensed lawyer, Richard found work at a bankruptcy law firm in Miami.  Because by this point Richard's mother had obtained her real estate license and was active in the community, he decided to leave the law firm and open his own practice in the hope his mother would refer closings. Notwithstanding his growing

success as a title attorney, Richard came to learn that his true passion (as he found out after his first deal), was real estate. While Richard initially bought and sold properties almost as an aside to his law practice, it quickly grew and took over his professional life.

Since getting involved in real estate and property development, Richard and his investment partners have injected millions of dollars into local communities with their projects. From the hiring of local contractors, architects, engineers, construction workers, and business employees to increased tax revenue – economic benefits from Richard's projects are felt in the cities and counties where he has invested.

Richard's professional successes were attained through his own efforts and labor. He has earned everything he has obtained through perseverance, determination, and hard work.  As Richard's first wife wrote, "[w]e started off our careers with absolutely nothing, just with a little financial backing from my family, a great college education, our natural workaholic habits, and some very good luck. With his incredible eye for real estate, our hard work, honesty, and correct work ethics we did well financially and provided a great life for our daughters." *Letter from Jeanette Raijman Bibliowicz.* (Richard's ex-wife).

Below are photos of some of Richard's commercial projects.

-20-



*Portofino Apartments in Tampa*



*Candlewood Suites near the Miami airport*



*Springtree Shopping Center in Sunrise, FL*



*Brickell Ten Condos*



*Prime 36 Restaurant*

Despite the success he has attained, Richard appreciates – from having heard about and seen the difficult times his parents and grandparents suffered – the importance of providing help and opportunities to others.  He knows that, but for the second and third chances his family received, their lives would have been signficantly different.  Consequently, Richard has been extremely generous to those who have not been as fortunate as he is.  "In terms of charity, Richard would help everyone and anyone that ever came to him without even thinking twice about it."  *Letter from Jeanette Raijman Bibliowicz*.  "[Richard] also offered me free housing when I was unable to afford my home any longer. He consoled me for hours upon hours any time I would call."  *Letter from Bertha Klepach*.  When one of Richard's daughters was ill and undergoing a littany of exams over a long period of time at Jackson Memorial Hospital, the Wasersteins saw the hard time other children were having. Richard felt like he had to do something for the less fortunate kids and decided to donate teddy bears for everyone in the unit (and all new admissions), he hired a clown to make the

rounds, and then made sure every child patient received Christmas presents for several years.  Rabbi Dalfin wrote that Richard has always supported programs "to help orphan children, feed families over the holidays and help the needy.  During Passover Richard has personally gone to the food distributor to purchase thousands of dollars' worth of meats, and personally delivered them from the distributor to our temple for distribution to needy families." *Letter from Rabbi Faivish Dalfin.*  During the past couple of years, Richard helped one of his tenants who was hit hard by the COVID shutdown.  Jean Claude Hudson had invested his life savings in a gym he opened.  During the pandemic, "Richard forgave my rent for over 6 months allowing me time to rebuild my client base.  As things got better Richard allowed me to pay 50% of the rent for over 18 months.  Richard had other tenants that were willing to rent my space for full price but gave me the time to sell the gym so that I could recover my life savings/investment." *Letter from Jean Claude Hudson.* As one of his longtime construction employees wrote, "[o]n a personal level, I almost lost my arm when a saw cut my arm while cutting some tile. Richard financially supported me during my downtime until I was able to recover and get back to work." *Letter from Alvaro Franco.* "By just explaining my financial situation and urgency to find good work, [Richard] was immediately ready to accept me into his office and to allow me to work by his side…" *Letter from Mauricio Bello.*

Richard made an effort to pass the importance of charity and compassion to his children.  While they were growing up, he would take his daughers to feed the homeless at shelters, visit senior centers to provide companionship to the elderly,

donate Channukah and Christmas toys and clothes to children in need, and deliver food to the poor for Thanksgiving. "Richard and I, as parents, did everything possible to help people in need and teach our three daughters the value of giving and that good things come from hard work and good ethics." *Letter from Jeanette Raijman Bibliowicz.* And as fondly said by his daughter Erika, "[m]y dad taught me it's better to be giving help than to be asking for it…As children, he would ask us to give some of our toys to the needy, he always puts his window down to help the homeless we pass on the street, and every Christmas we would give presents to all the children at Jackson Memorial Hospital…My dad asked for no recognition, it just made him happy being able to help families in need." *Letter from Erika Schlacter.* Richard is very close with his children, as seen in the following photos. Finally, in the words of his parents, "Richy is and has always been a family man. He is the best son a parent can ask for." *Letter from Mr. & Mrs. Waserstein.*



Below are photos of Richard donating Chanukah presents to boys' and girls' orphanages in Israel; donating food for 50 families after a disaster in Ecuador; and contributing to a charity that organizes Bar and Bat Mitzvahs for orphans in Israel.





Richard's good deeds were not limited to financial donations; he has also been generous in giving his time.  In his community, Richard pushed to improve the bus system routes "so that the elderly would not have to walk blocks to take a bus." *Letter from Jeanette Bibliowicz.*  He advocated for the building of the Shul of Bal Harbor. "While Richard was Vice Mayor [of Surfside], our phone never stopped ringing from neighbors asking for things at all hours of the day since they knew Richard was always there to listen and try to help." *Id.*  Richard also contributes school supplies for 500 inner city children each year in participation with the New Jerusalem First Missionary Baptist Church. *See Letter from Rev. Michael K. Anderson.*

Richard also assisted a friend in confronting an abuser who had sexually assaulted his friend's son. "Through [Richard's] efforts, we were able to remove said abuser from his position as a school principal for adolescent boys, thus preventing him from being a future threat to other young boys…. Richard's efforts on behalf of my son played a major role in helping him begin the healing process." *Letter from Rabbi Yacov Borenstein*. When another friend suffered a massive heart attack, was unable to work, and lost his home and family, Richard was by his side providing constant encouragement and hope. "My conversations with him were always motivating me to keep going when I was at my most vulnerable." *Letter from Daniel Douer*. In lasting gratitude, Norma Pirex wrote how Richard provided six months of free rent, groceries, and a job to her after her ex-husband left without notice to her or their three children to Brazil. To this day, Richard remains a mentor and open book for Ms. Pirex and her now grown children. *Letter from Norma Pirex*.

Consistent with Richard's lifelong commitment to helping the needy, the Aleph Institute, led by Rabbi Lipskar, has prepared an alternative sentencing recommendation for the Court's consideration. *See* Exhibit A, *Letter from Aleph Institute*. Richard has contributed to Rabbi Lipskar's causes over the preceding 30 years. Because Rabbi Lipskar knows Richard and his wonderful character, Richard has been the only person Rabbi Lipskar has ever endorsed for political office.

Courts have repeatedly found that these types of outstanding charitable works deserve recognition and support significant downward variances. *See United States v. Tomko*, 562 F.3d 558, 560 (3d Cir. 2009) (*en banc* appellate court affirming a

downward variance to a non-incarcerative sentence for prior good works where "letters written on Tomko's behalf prior to his sentencing … demonstrated Tomko's community ties and extensive charitable works. These letters indicate that Tomko performed pre-indictment charitable acts that involved not only money, but also his personal time."). *See also United States v. Thurston*, 544 F.3d 22 (1st Cir. 2008) (affirming district court's sentence of 3 months rather than 60-month guideline term for Medicare fraud conspiracy of more than $5 million, citing, among other things, defendant's charitable work, community service, generosity with his time, and the spiritual support and assistance he provided others); *United States v. D'Amico*, 496 F.3d 95 (1st Cir. 2007) (defendant's charitable efforts and contributions to the community warranted a downward variance); *United States v. Cooper*, 394 F.3d 172 (3d Cir. 2005) (affirming 4-level departure to probation in securities fraud and tax evasion case based on defendant's good works where guidelines called for 14-21 months; defendant did not simply donate money to charity but made "hands on personal sacrifices which have a dramatic and positive impact on the lives of others."); *United States v. Woods*, 159 F.3d 1132 (8th Cir. 1998) (defendant's exceptional charitable efforts in taking in two troubled young women, financing their private education, and assisting an elderly friend's move from a nursing home justified departure).

Like the defendant in *Tomko* and similar cases, throughout his life, Richard Waserstein has demonstrated the kind of personal characteristics, generosity, citizenship, and history of giving that render him deserving of a downward variance.

Richard has made countless contributions to his community that had a dramatic and positive impact on the lives of others.

Another court weighed the fact that, like Richard, the defendant's "good deeds were not performed to gain status or enhance his image. Most of them were unknown to all but a few people until the time of his sentencing. But, surely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, 'the history and characteristics of the defendant.'" *United States v. Adelson*, 441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006) (emphasis added), *aff'd* 301 Fed. Appx 93 (2d Cir. 2008).

Consistent with the commendable character described by Richard's friends and family in the character letters, it also bears mentioning that Richard has taken voluntary steps to apprise the Florida Bar of his involvement in this case. Richard has agreed to surrender his license and not seek readmission. While he is embarrassed, ashamed, repentant, and remorseful for his actions, Richard understands and respects the need to avail himself to the full gambit of repercussions for his actions, both punitive and professional.

Apart from the loss of his law license, Richard has and will continue to experience numerous professional punishments as a result of his involvement in

Compass and WAR. Since the Indictment was filed in this case, numerous banks have placed Richard in breach of his lending agreements, meaning the loans were all called. What is more, numerous long-standing investment partners now shun Richard and have insisted he divest partnership shares. Needless to say, the professional toll this case has taken on Richard and his hard-earned reputation has been nothing short of catastrophic.

### V.   Richard has Serious Health Conditions that cannot be adequately treated by the Bureau of Prisons.

In addition to charitable work and good deeds, age and illness may be considered as part of a defendant's history and characteristics supporting a downward variance. 18 U.S.C. § 3553(a). *See also Gall v. United States*, 128 S. Ct. 586, 593, 599 (2007)(affirming sentence of probation, in part, for defendant's age at the time of the offense conduct); *United States v. Chase*, 560 F.3d 828 (8th Cir. 2009) (defendant's advanced age, health, and employment history could support downward variance even if it did not support formal departure); *United States v. Villanueva*, 2007 WL 4410378 (E.D. Wis. Dec. 14, 2007) (courts are able to base variances onfactorsnormally discouraged under the Guidelines including age and physical condition ).

As permitted under § 3553(a), Richard's medical conditions warrant weight in his request for a downward variance.  In addition to experiencing high cholesterol and high blood pressure, Richard is under the care of multiple doctors for more significant ailments, including type-II diabetes and recurring pre-cancerous colon polyps. For his different medical issues, Richard takes eight different medications

which frequently change depending upon the results of his most recent examinations. *See* Exhibit B, List of Medications.

Although he is active and not overweight, Richard's diabetes diagnosis is concerning to his doctors.  Because the medicine used to treat blood pressure produces a side-effect known to affect kidney function, Richard must continually monitor his kidney function levels to avoid renal failure. In clinical terms, "…Mr. Waserstein[] suffers from significant Metabolic Syndrome including uncontrolled diabetes, uncontrolled hypertension, uncontrolled hyperlipidermia and elevated BMI." *Letter from Dr. Zev Neuwirth.*

Apart from his diabetes, Richard's history of recurring precancerous polyps is his most serious medical issue. Due to hereditary factors, Richard has a mutation in the GREM1 gene that causes him to have colon polyps, which if not monitored, biopsied and removed, case easily become cancerous.  At his last colonoscopy in December of 2021, Richard had 14 polyps that needed to be biopsied and removed. He is currently set for his next colonoscopy in June of 2022 and then again in December.  Richard's gastroenterologist requires him to be screened every six months to ensure new growths do not turn into cancerous tumors.

Screenings and biopsies are extremely delicate procedures that the Bureau of Prisons is generally not equipped to handle. Inmates requiring these invasive procedures need to be referred to clinics or hospitals, which often times means medical screening and treatment schedules are left behind to the bureacracy of administrative process. Per the Bureau of Prisons *Clinical Guidance on Preventative*

*Healthcare Screening*, inmates who are at higher risk for colon cancer, including Richard, should follow, "the *American Cancer Society Recommendations for Colorectal Cancer Early Detection.*[3]  Because of his family history and owing to the polyps, Richard is in a high-risk category for colorectal cancer, and screening should be more frequent than would otherwise be appropriate.

According to the BOP's *Clinical Practice Guidance, Care Level Classification* guide, Richard would likely fall into Care Level 2 (of 4). "Care Level 2 inmates are stable outpatients who require clinician evaluations monthly to every 6 months…Enhanced medical resources, such as consultation or evaluation by medical specialists, may be required."[4] The guide specifically lists medication-controlled diabetes is an example of a Care Level 2 condition. However, should one of Richard's polyps turn cancerous, he would likely find himself in Care Level 3, which would necessitate designation to a Federal Medical Facility. The fact that Richard is teetering on the edge of a Care Level 3 rating should compel the conclusion that his health conditions are serious and not to be taken lightly.

Title 18 U.S.C. § 3553(a)(2)(D) contemplates the need for sentencing judges to consider a defendant's medical condition in arriving at a sentence that is sufficient, but not more than necessary. Downward variances based on medical conditions are routinely upheld. *See United States v. Almenas,* 553 F.3d 27 (1st Cir. 2009) (affirming downward variance of 43 months below the bottom of the guideline range based on

---

[3] https://www.bop.gov/resources/pdfs/phc.pdf
[4] https://www.bop.gov/resources/pdfs/care_level_classification_guide.pdf

defendant's combination of physical and mental disabilities); *United States v. Meyers*, 503 F.3d 676 (8th Cir. 2007) ("district court did not abuse its discretion finding that a shorter period of incarceration, with mental health treatment and supervised release, is the most effective sentence").

This applies to Richard as well. The complex nature of Richard's health requires monthly monitoring. A significant incarcerative sentence could present an unnecessary risk to Richard's health. Even a short term of incarceration will without question exacerbate his health conditions, impede access to adequate medical treatment, and frustrate his current treatment plan. As articulated by Dr. Zev Neuwirth in summarizing the state of Richard's health, "I am therefore of the opinion that Mr. Waserstein's precarious and delicate medical conditions require frequent in-person medical assessment, along with aggressive on-going treatment and oversight, which would be best suited while maintaining an in-home residency status along with regular medical exams, testing, response to therapy monitoring and management." *Letter from Dr. Zev Neuwirth.*

## CONCLUSION

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate ... the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996). Here, Richard has taken complete responsibility for his involvement in a conspiracy to commit money laundering. He does not seek to justify, minimize, or explain away these actions. He knows they were wrong.

But we ask the Court to also judge Richard by the accumulation of his actions before and since his crime—actions which demonstrate integrity, morality, and kindness towards others. And also which, importantly, resonate with an overwhelming remorse for the wrong he has done.

These actions that the Court must also judge Richard by include his substantial and successful cooperation with the Government; his lesser culpability in relation to every other defendant; his exemplary personal history and characteristics which include decades of serving his community and employing hundreds of people; dedication to his family; and no risk of recidivism. These actions illustrate that Richard is capable of redemption and is worthy of the Courts power of leniency.

WHEREFORE we respectfully request that this Court sentence Richard Waserstein to a sentence less than Drew Lieberman.

Respectfully submitted,

**MARKUS/MOSS PLLC**
40 N.W. Third Street, PH1
Miami, Florida  33128
Tel: (305) 379-6667
Fax: (305) 379-6668
markuslaw.com

By:   /s/ David Oscar Markus
David Oscar Markus
Florida Bar Number 119318
dmarkus@markuslaw.com

/s/ A. Margot Moss
A. MARGOT MOSS
Florida Bar Number 091870
mmoss@markuslaw.com